**TRANSCO PRODUCTS INC., Plaintiff,**

v.

**PERFORMANCE CONTRACTING, INC. and Performance Contracting Group, Inc., Defendants.**

**No. 89 C 8001.**

United States District Court, N.D. Illinois, E.D.

May 18, 1993.

Robert E. Wagner, Roger H. Stein, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, for plaintiff.

John S. McCambridge, Charles S. Bergen, Darrell J. Graham, Grippo & Elden, Chicago, IL, Robert A. Vanderhye, Nixon & Vanderhye, P.C., Arlington, VA, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court has now been thrice blessed (?) with what have been labeled summary judgment motions in this action between Transco Products Inc. ("Transco") and Performance Contracting, Inc. and Performance Contracting Group, Inc. (collectively "Performance Contracting," treated as a singular noun). Although the first two sets of submissions did not lead to a definitive resolution of the lawsuit, this third time proves the charm.

Transco originally filed suit (1) seeking a declaratory judgment of invalidity, noninfringement and unenforceability of United States Patent No. 4,009,735 (the "Pinsky patent") owned by Performance Contracting, and (2) relatedly charging Performance Contracting with infringement of Transco's United States Patent No. 3,941,159 (the "Toll patent"). Performance Contracting counterclaimed, seeking a declaratory judgment of invalidity and unenforceability of the Toll patent and charging Transco with infringement of the Pinsky patent.

This Court's May 12, 1992 "Opinion 1" (792 F.Supp. 594) (1) denied Performance Contracting's motion for summary judgment on the issue of invalidity of the Toll patent and (2) granted Performance Contracting's motion for summary judgment as to its noninfringement of the Toll patent. Then the January 28, 1993 "Opinion 2" (813 F.Supp. 613) dealt with another set of cross-motions,

this time respectively seeking a judgment of infringement or noninfringement of the Pinsky patent by Transco's products. Opinion 2 denied both those motions.[1]

In briefing that last set of motions, Transco raised but did not squarely address the possibility of the Pinsky patent's invalidity because of its noncompliance with 35 U.S.C. § 112 ("Section 112"): that is, whether inventor Pinsky had failed to disclose the best mode of practicing the invention. At this Court's request the parties have now confronted that issue in the form of Transco's motion for partial summary judgment under Fed.R.Civ.P. ("Rule") 56,[2] asserting invalidity of the Pinsky patent on that ground. Their briefing has been more extensive than the three-memorandum pattern normally followed on any motion other than simultaneous cross-motions:

1. On February 10, 1993 each side submitted an initial memorandum: Transco's (cited "P. Mem. 1 at —") in support of its Rule 56 motion, and Performance Contracting's (its "D. Mem. 1") also addressing the best mode question.

2. On February 24 Performance Contracting filed its memorandum (cited "D. Mem. 2 at —") in opposition to Transco's summary judgment motion.[3]

3. On March 15 Transco filed its reply memorandum (cited "P. Mem. 2 at —") in support of its motion.

4. Finally, Performance Contracting requested and was granted leave to file a surreply memorandum, which it submitted on April 9.

Based on its consideration of all the parties' filings, this Court grants Transco's motion.

---

1. Opinion 2 will be cited here as "Opinion 2 at —," referring to the page number but omitting the F.Supp. volume number.

2. Even though Transco has labeled its motion for summary judgment as "partial," this opinion's ruling in its favor spells an end to this litigation.

3. Although Performance Contracting suggests in D. Mem. 2 at 3 "that summary judgment that the Pinsky patent *fulfills* the best mode requirements should be entered," it has not filed this District Court's required General Rule 12(M) statement in support of such a judgment, nor has it styled any of its written submissions as being support-

## Rule 56 Standards

Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (in this case Performance Contracting) (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)).

This District Court's General Rules 12(M) and 12(N) require factual statements in support of and in opposition to Rule 56 motions, and both sides have once again tendered such statements.[4] Transco's statement in support of its motion is cited as "P. 12(m) —," while Performance Contracting's responsive statement is cited as "D. 12(n) ¶ —."

## Facts

On October 2, 1974 Gordon Pinsky ("Pinsky") filed a continuation of his original October 24, 1973 application with the United States Patent Office covering a pipe insulation design (P. 12(m), D. 12(n) ¶¶ 4, 5). On March 1, 1977 the Pinsky "Thermal Insulation" patent (the "Pinsky patent") issued, containing these four claims (P.Ex. 35, col. 4):

1. Readily removable and replaceable rewettable thermal insulation for use on vessels and piping within reactor containment areas of nuclear power plants comprising high temperature resistant mineral

---

ive of a motion to that effect. At best, then, its suggestion of summary judgment in its favor could be treated as an invitation to this Court to enter such a ruling sua sponte.

4. Because this is not the first time that the parties have returned to the well, it might have created some confusion with Opinion 2 if the current statements had again begun from ground zero. Instead the parties have sensibly begun numbering the paragraphs in their statements in support of and in opposition to Transco's current motion at the point where the last set of statements left off.

fiber or glass fiber encapsulated within rewettable, high temperature resistant, asbestos free glass cloth held in place with a plurality of spaced quick release and engage fasteners, wherein the glass cloth can withstand repeated wettings from spray systems within the reactor containment areas of nuclear power plants and wherein the fasteners are two woven nylon, hook and loop mating strips; wherein the glass cloth has a finish of a leachable, organic silicate carried in a fatty and mineral oil vehicle.

2. Thermal insulation according to claim 1 wherein the encapsulated fiber is a fine fiber and is in the form of tangled or felted mats.

3. Thermal insulation according to claim 2 wherein the mats are quilted.

4. Thermal insulation according to claim 1 wherein the strips comprise a hook strip covered with stiff little hooks and a loop strip covered with tiny, soft loops.

Transco began marketing blanket-type insulation for nuclear power plant containment areas as early as 1982 (D.Ex.M). In three letters dated February 13, March 8 and September 11, 1989 (Complaint Exs. B, C, D) Performance Contracting notified Transco that it believed Transco was infringing the Pinsky patent. That led to Transco's October 25, 1989 Complaint in this action.

### Best Mode

In exchange for the fixed term of monopoly rights granted by the patent laws, Section 112 requires that "[t]he specification shall contain a written description of the invention ... and shall set forth the best mode contemplated by the inventor of carrying out his invention." Its "purpose ... is to restrain inventors from applying for a patent while at the same time *concealing* from the public preferred embodiments of their inventions which they have in fact conceived" (*Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575, 1579 (Fed.Cir.1991)). There are two steps to a best mode analysis (*Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923, 927–28 (Fed.Cir.1990)):

The first is whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other. This part of the inquiry is wholly subjective, and resolves whether the inventor must disclose any facts in addition to those sufficient for enablement. If the inventor in fact contemplated such a preferred mode, the second part of the analysis compares what he knew with what he disclosed—is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor "concealed" his preferred mode from the "public"? Assessing the *adequacy* of the disclosure, as opposed to its *necessity*, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art.

Transco contends that the best mode requirement was violated by the Pinsky patent's failure to disclose several elements of Pinsky's preferred mode of practicing the invention:

1. Burlington Industries' cloth with what was called its "603A" finish (P. 12(m) ¶ 70);

2. placement of the fastener parallel to, rather than perpendicular to, the junction of the insulation (P. 12(m) ¶ 75);

3. a fabric flap carrying one of the mating strips over to meet the other (*id.*);

4. stainless steel hooks in the fastener strips (P. 12(m) ¶ 85); and

5. a fiberglass scrim placed between the glass wool batt and the glass cover (P. 12(m) ¶¶ 95–96).

Those elements are considered here in turn.

#### 1. *Burlington Industries' Cloth with 603A Finish*

Transco asserts that before Pinsky filed the original October 23, 1973 application both he and his attorney knew that the fabric Pinsky preferred to use was Burlington Industries' glass cloth with a 603A finish (P. Mem. 1 at 5, citing several evidentiary sources). But instead of the patent specification naming the 603A cloth, it merely described glass cloth with "a finish of a leachable, organic silicate carried in a fatty and mineral oil vehicle" (P.Ex. 35, col. 4). Pinsky

had arrived at that description by sending a sample to his employer Owens Corning's laboratories (P.Ex. 67, Pinsky 9–12–91 Dep. 261).

Pinsky acknowledged that when the original application was filed he thought that the Burlington Industries cloth with a 603A finish "was the product that had the greatest possibility of working" (P.Ex. 54, Pinsky 9–12–91 Dep. 371). When asked whether he knew of any other finish that would work, Pinsky replied (P.Ex. 67, Pinsky 9–12–91 Dep. 332):

> I was not an expert in finishes. I didn't have any real particular thought. There may or may not have been other finishes or other things in the future that could work, or a combination or changes or verifications, but I didn't have any particular knowledge this one worked. This is the one we were going with.

Performance Contracting admits that the 603A fabric was Pinsky's best contemplated mode of practicing the invention (D. 12(n) ¶¶ 56–58). Nonetheless it insists that the second element of the best mode requirement was satisfied because the generic description of the finish ("a leachable, organic silicate carried in a fatty and mineral oil vehicle") was "adequate to enable one skilled in the art to practice the best mode" (see *Chemcast*, 913 F.2d at 928). It contends that

the quoted description "would be understood by one of ordinary skill in the art of finishes for glass cloth in 1973 to be a generic description of Burlington cloth with a 603A finish" (D.Mem. 2 at 4). Performance Contracting points out that Pinsky also disclosed the reason that the finish was important: to allow it to meet the requirements of Mil–I–24244 and CFL–164.009 (D.Mem. 2 at 5, citing Pinsky February 23, 1993 Aff. ¶¶ 9, 10).[5] Transco argues in response that the description of the finish would not allow one skilled in the art to practice the best mode on two separate grounds:

1. the description of the finish was incorrect; and

2. even if the description of the finish were viewed as accurate, the fabric was not generally known to the public and hence was not generally available absent an express disclosure that it was the best mode.

### A. Inaccurate Description

Transco initially maintains that description of the finish in Claim 1 of the Pinsky patent was inaccurate and misleading (P.Mem. 1 at 6). On May 16, 1983 Burlington Industries' plant chemist Charles Jones wrote a letter to Transco (P.Ex. 43 at 1)[6] describing the 603A finish as:

> 2. That statement was confirmatory of the patent specification itself, which had made clear the importance of the cloth's characteristics (P.Ex. 35, col. 2):
> The finished fabric meets the requirements of U.S. Navy specification Mil–I–24244 with regard to chemical analysis and chemical resistance of materials used in the insulation of stainless steel, as well as the requirements of Coast Guard specification CFL–164.009 relating to incombustible materials. The glass cloth of this invention can withstand repeated wettings from spray systems within reactor containment areas of nuclear power plants and can withstand temperatures of 700 F. for at least 40 years.
> 3. To the same effect, the Reexamination Request of September 11, 1984 stressed the unique properties of the cloth (P.Ex. 61 at 5).

---

5. Pinsky suggests in Paragraph 10 of that affidavit that he did not view the glass cloth and finish as part of his invention. Although Performance Contracting's memoranda do not pose the argument in just these terms, if the cloth and finish were not in fact integral to making and carrying out the best mode of Pinsky's claimed invention, then *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1301 (7th Cir.1989) and *Randomex Inc. v. Scopus Corp.*, 849 F.2d 585, 588–89 (Fed.Cir.1988) make it clear that no best mode problem would exist. But this Court cannot credit Pinsky's apparent current change of heart along those lines in light of no fewer than three earlier statements to the contrary, all of them antedating this Court's inquiry that triggered the current motion, which made the issue relevant in the "best mode" context:

 1. Pinsky's July 24, 1992 affidavit (P.Ex. 40 ¶ 11 at 7) had said:
 Because I knew in the nuclear power plant environment fire safety was important, and stress corrosion cracking must be prevented, it was essential to me that any finish on the glass cloth meet the stress corrosion requirement, and desirably be incombustible.

6. Performance Contracting argues that the letter from Charles Jones is "not evidence" because it is "unauthenticated" (D. 12(n) ¶ 63). Transco responds that the letter "is clearly a business record" (P. Mem. 2 at 9 n. 3). Although Transco

involv[ing] burning off any binders and lubricants that are contained on the suppliers yarns and adding an inorganic silicate and a softener as indicated on the MSDS. This finishing technique enables the fabric to meet all the requirements of Mil C–20079, Mil I–24244B, and NRC Guide 1.36.

\* \* \* \* \* \*

In relation to the addition of an organic silicate and fatty mineral vehicle to enhance the resistance to deterioration by the acidic containment spray, I am not familiar with the use of such products for this purpose.... With these type finish, they would not qualify under the prior mentioned specs.

Transco also presents the affidavit of its President Elliot Avery, who states (P.Ex. 60 ¶ 6):

We have dealt with people in the glass cloth industry and I am aware of no one today or in 1973 who knows what this description ... is for.

Lastly Transco cites the admissions by Pinsky and Dennis Vaughan (director of research and development of Clark–Schwebel Fiber Glass Corp.) that there really is no such thing as an "organic silicate" (P.Ex. 40 ¶ 11, P.Ex. 41 ¶ 3).

To counter that evidence Performance Contracting cites to the July 24, 1992 affidavits of Pinsky (P.Ex. 40 ¶ 11) and Dennis Vaughan (P.Ex. 41 ¶ 3), both of whom assert that one of ordinary skill in the art of finishes for glass cloth in 1973 would have understood "a leachable, organic silicate carried in a fatty and mineral oil vehicle" to be a generic description that embraces Burlington Industries' 603A cloth.[7] Vaughan explained (id.):

The 603A finished cloth has fatty and mineral oil organic components that remain on the cloth (although not enough to prevent it from meeting CFL–164.009), and the silicate is not "inorganic sodium silicate," and as clearly demonstrated by the test results which show 603A finished cloth meets Mil–I–24244, the finished cloth has silicate[ ] in the form that will leach.

▉▉ Pinsky's own admission that "I was not an expert in finishes" (P.Ex. 67, Pinsky 9–12–91 Dep. 332) casts doubt on the reliability of his own affidavit in that regard. But for purposes of Transco's motion, reasonable inferences must be drawn in favor of Vaughan's affidavit that one of ordinary skill in the art of glass finishes would understand

has not disclosed the nature of the inquiry made to Jones, the letter seems to have been written not in the ordinary course of business but in response to Transco's inquiries for purposes of preparation for litigation. Even so, Performance Contracting's bare objection to the letter as unauthenticated cannot stand without a serious contention that the letter is a fake—something that Performance Contracting has not suggested.

Performance Contracting also says that the letter does not advance Transco's argument because "it merely responds to the question regarding if something was added 'to enhance the resistance to deterioration by the acidic contaminant spray,' which is not the purpose of the finish" (D. 12(n) ¶ 63). Transco responds with evidence of the high acidity of the nuclear wash down system (P. Mem. 2 at 9 n. 3, citing D. Ex. 1 at ¶ 3.1, P.Ex. 63 at 200674), and it also cites the Reexamination File Wrapper stating that the finish is added to "prevent and eliminate stress corrosion cracking" (P.Ex. 61). In addition, Performance Contracting ignores the last sentence in that same paragraph, which states that "With these type finish, they would not qualify under the prior mentioned specs" (P.Ex. 43)—that is, Mil C–20079, Mil I–24244B, and NRC Guide 1.36.

Testimony from Jack Waddington of JPS Glass Fabrics, the weaver and finisher of the 9383 cloth used by Transco and considered by suppliers to be the equivalent of the 603A finished cloth, was essentially similar to Jones' statement. Waddington testified that JPS Glass does not put on a finish of "a leachable, organic silicate carried in a fatty and mineral oil vehicle" (P.Ex. 58, Waddington Dep. 73). Waddington explained that the finish is not a process of adding anything to the fabric at all. Instead it is a process of heating the fabric to "remove any oils and lubricants that either PPG or ourselves have put on there so that when these things go into those hot areas, we don't have any smoke" (id. at 38).

7. Transco takes a different perspective as to the relevant "art" for purposes of inquiring what the hypothetical person of ordin..ry skill would have known: It argues for the art of making insulation blanket products for pipes (P. Mem. 1 at 7). But Transco cites no support for that position, and the case law is stacked against it (see, e.g., Wahl Instruments, 950 F.2d at 1581; In re Naquin, 398 F.2d 863, 866 (C.C.P.A.1968) ("When an invention, in its different aspects, involves distinct arts, that specification is adequate which enables the adepts of each art, those who have the best chance of being enabled, to carry out the aspect proper to their specialty")).

the description "a leachable, organic silicate carried in a fatty and mineral oil vehicle" to be a generic description for the Burlington Industries' 603A cloth. Thus Transco's motion for summary judgment must be denied to the extent that it asserts a failure to disclose the best mode due to an inaccurate description of the preferred finish.

### B. *Availability of Product to Public*

As already indicated, the second aspect of Transco's argument as to the 603A finish is that Pinsky had a duty to disclose the maker of the fabric because the finish itself was not generally known to the public. In that respect Pinsky testified (P.Ex. 54, Pinsky 9–12–91 Dep. 333) that at the time Burlington came out with the 603A fabric: [8]

[T]hey were the only supplier. Other people were going to come into market and try to come up with variations, and there may be different variations of that.

Pinsky also stated (P.Ex. 67, Pinsky 9–12–91 Dep. 328, 330–31) that the Burlington fabric was:

a new product that they were in the final phases of introducing, or had introduced just recently or something. It was not a general industry-wide familiar product. He said something to the effect of it's very convenient because we think we've got a product now that will be able to do what you need. We've been doing some testing and development, and we think we can get you something that will work.

\* \* \* \* \* \*

Mr. Ivers had none of his standard literature which displayed these products in it. He had lots of standard literature on products. This is one there was no published literature on. It was a new product. I have no reason to believe that he ever made this particular combination and sold it to anyone else.

\* \* \* \* \* \*

Burlington was not mass marketing the product. That's my understanding.

Transco also suggests that Owens Corning concealed the identity of the cloth from the Patent and Trademark Office and the public: Rather than identifying the source of the material, Owens Corning Fiberglas' 1977 Topical Report Glossary (P.Ex. 48 at A–6), states:

[T]he outer cover cloth for this blanket is produced specifically for the Owens–Corning Fiberglas Containment System.

Although Performance Contracting denies that the 603A finish was not well-known in 1973 (D. 12(n) ¶ 66), it cites as evidence only the 1991 affidavit of Dennis Vaughan (P.Ex. 41). Although Vaughan expressed his then familiarity with the 603A finish, he did not state when he or anyone else first learned about the product. Thus his testimony provides no support at all for Performance Contracting's denial.

*Chemcast*, 913 F.2d at 929 made clear that "disclosing a list of generic potential materials" may not always be "an adequate disclosure of the best mode." In that case the grommet used in the invention at issue was specifically created by another company for the inventor's use. As was true with Burlington's 603A cloth and Pinsky, it was the *only* embodiment known to the inventor when the patent application was filed (*id.*). Indeed, it was the only type of grommet that the inventor in *Chemcast* ever used in the invention. Rather than disclosing the specific properties and the manufacturer of the grommet, however, the specification merely described a general range of hardness within which the grommet fell. Finding that inadequate, *Chemcast, id.* (citation omitted) stated:

That "at least eight other PVC composition suppliers [ ] could have formulated satisfactory materials for the dual durometer grommet" does not, as Chemcast urges, excuse Rubright's concealment of his preferred material, and the only one of which he was aware. Again Chemcast confuses enablement and best mode. The question is not whether those skilled in the art could make or use the '879 grommet without knowledge of Reynosol compound R–4467; it is whether they could practice Rubright's contemplated best mode which, the court found, included specifically the

---

8. Burlington's fabric with 603A finish "became a production finish on 10/13/72" (P.Ex. 62 at 5).

Reynosol compound.... Because Chemcast used only R–4467, because certain characteristics of the grommet material were claimed elements of the '879 invention, and because Rubright himself did not know the formula, composition, or method of manufacture of R–4467, section 112 obligated Rubright to disclose the specific supplier and trade name of his preferred material.

Performance Contracting contends that *Chemcast* would have found no best mode problem "if a generic description of the product (rigid PVC plastisol composition) as well as the critical property (a locking portion with hardness of 75 Shore D), had been disclosed" (D.Mem. 2 at 5).[9] But *Chemcast* itself indicates just the opposite: that both the generic properties of the locking portion of the grommet and the identity of the supplier and trade name were required. In describing the decision below, the Federal Circuit pointed out that the lower court had invalidated the patent for failure to disclose (1) the particular type, (2) the hardness and (3) the supplier and trade name of the material used to make the locking portion of the grommet. *Chemcast, id.* (emphasis added) stated:

> In light of what [the patentee] knew, the specification, as issued, was manifestly deficient.... The material hardness ... *and* supplier/trade name ... are not explicitly disclosed here or anywhere else in the specification.

> \*　　\*　　\*　　\*　　\*　　\*

As for the specific supplier and trade name designation of the preferred material, the [district] court found that disclosing a list of generic potential materials was 'not an adequate disclosure of the best mode PVC Re[y]nosol Compound R–4467'.... We agree.

Nowhere did the Federal Circuit suggest that a description of the generic properties, without the name of the patentee's supplier, would have been sufficient.[10]

■ In this case, as in *Chemcast*, Pinsky used only one type of material. All he knew of its manufacture and composition was what the testing of the final product in Owens Corning's laboratory had revealed.[11] Although Burlington Industries did not develop the 603A finish specifically for Owens Corning, Performance Contracting has presented no evidence to counter the admissions in Pinsky's deposition testimony that the finish was not well known, was not promoted commercially and had not, to his knowledge, been sold to anyone else. Especially given Pinsky's lack of specific information about the finish, it is really a contradiction in terms for Performance Contracting to argue that Pinsky could provide a general description sufficient to enable the skilled-in-the-art reader to practice the art.[12] *Chemcast* teaches that in such a case both the generic properties of the preferred material and the trade name and supplier of the material must be revealed. As *Dana Corp. v. IPC Ltd. Part-*

---

9. Although Performance Contracting insists that this case is exactly like *Wahl Instruments*, Performance Contracting has not presented evidence that the choice of the 603A material was one of efficiency or convenience such as that described in *Wahl Instruments*, where "the manufacturing equipment was on hand, certain materials were available, prior relationship with supplier was satisfactory, or other reasons having nothing to do with development of the invention" (950 F.2d at 1581).

10. Although this problem is the reverse of that treated in *Randomex*, 849 F.2d at 589, where the court stated that disclosure of the tradename of a preferred element alone, without a description of its generic properties, would not be enough when there are no suitable substitutes on the market, *Chemcast* prevents induction from *Randomex* that a generic description is sufficient in a case such as this.

11. Unlike in *Chemcast*, no argument has been advanced here that Pinsky did not make a good faith attempt to describe accurately the generic properties of the material he used. Transco disputes the accuracy of the description but does not allege a complete failure to attempt to describe the best mode as in *Chemcast*. But the relevant point is the one made in the text: Pinsky's good faith effort at disclosure was necessarily circumscribed by the limited scope of his own knowledge.

12. As already noted, Owens Corning Fiberglas' 1977 Topical Report Glossary (P.Ex. 48 at A–6) states that "[t]he outer cover cloth for this blanket is produced specifically for the Owens–Corning Fiberglas Nuclear Containment System."

*nership*, 860 F.2d 415, 419 (Fed.Cir.1988) put it:

> Even though there may be a general reference to the best mode, the quality of the disclosure may be so poor as to effectively result in concealment.

*Wahl Instruments*, 950 F.2d at 1583 n. 4 provides instruction in this regard as well, albeit in the negative, by stating "there is no *per se* requirement to provide names for sources of materials absent evidence that the name of the source would not be known or easily available." Performance Contracting has presented no real evidence at all that the 603A finish was known in 1973. To be sure, Pinsky has said in his February 23, 1993 Aff. ¶ 10:

> In 1973 and 1974 there were only a handful of significant fiberglass cloth manufacturers; the only three of any size were Burlington, J.P. Stevens, and Clark–Schwebel, and all three of these were well known to those seeking to purchase glass cloth for industrial applications.

Pinsky had also testified earlier (P.Ex. 67, Pinsky 9–12–91 Dep. 336–37) that the 603A finished cloth was "commercially available in 1973. You could issue a purchase order and they would sell it to you."

■ But the combined effect of that evidence, which would require an inquiry in the blind (really detective work) on the part of the skilled-in-the-art reader—an inquiry seeking to uncover information that was already specifically known to and readily disclosable by Pinsky—does not rise to the level of evidence that the specific nature and

source of Pinsky's preferred fabric would be "known or easily available" to such a reader in 1973. That being true, Transco's motion for summary judgment of violation of the best mode requirement by Pinsky's original patent application must be granted to the extent that it is based on Pinsky's failure to disclose the supplier of his preferred fabric.[13]

## 2. Placement of the Fastener Parallel to, Rather Than Perpendicular to, the Junction of the Insulation

One of the elements of the Pinsky invention was the use of Velcro © fasteners, which provided ease of installation and removal not found with other commonly used fastening systems (P.Ex. 3 at T–102). Although neither the claims nor the specification made any reference to the placement of the Velcro © strips, drawings submitted with Pinsky's patent application depicted the Velcro © fasteners traversing the line where the edges of the insulating blanket met. Transco says that "a team, which included Mr. Sutton and Mr. Pinsky, relocated and reoriented the fastener(s) from circumferential to longitudinal and added a longitudinal flap to carry one of the mating strips" (P.Mem. 1 at 9–10).[14] Notes from an Owens Corning meeting discussing the blanket insulation included, under the heading *"Decisions,"* the statement "Velcro to be applied parallel to longitudinal lap" (P.Ex. 38a at 1). As Transco points out, Pinsky did not reveal that change in his October 2, 1974 continuation application (P.Mem. 1 at 10).

---

13. This opinion's subsection 1.A credited Dennis Vaughan's affidavit testimony that a person of ordinary skill in the glass finishing art would have understood in 1973 (as today) that "a leachable, organic silicate carried in a fatty and mineral oil vehicle" would be a generic description matching the actuality of the 603A finish. *In re Sherwood*, 613 F.2d 809, 816–17 (C.C.P.A.1980) teaches that if one of ordinary skill in the art could practice the best mode from the patent disclosure, the best mode requirement is met. Here the problem confronting Performance Contracting is that although the skilled person could presumably have practiced the art if he or she were actually furnished a product that had the characteristics set out in the generic description, there is no showing that the mere statement of those characteristics would enable the skilled person to replicate the fabric. Hence Pinsky's

nondisclosure of the source for the best mode material is the equivalent of concealment if that source was not otherwise known. Thus Vaughan's testimony cannot overcome Performance Contracting's total lack of evidence as to public familiarity with the 603A finish in 1973.

14. Transco cannot prevail on its claim that the Owens Corning team reoriented the fasteners "because this circumferential arrangement failed, due to the heat burning the fastener transversing the seam" (P. Mem. 1 at 9). Pinsky testified otherwise, stating (P.Ex. 54, Pinsky 4–9–91 Dep. 62–63) that circumferential Velcro © strips could work if properly installed, and that the change was made because longitudinal strips "looked better and [] fit better."

Performance Contracting cites Pinsky's February 23, 1993 Aff. ¶ 11 as evidence that longitudinally-placed Velcro ©, although an option, was not the preferred mode:

> On October 2, 1974 I had worked with both circumferential and transverse (or longitudinal) fasteners, but I did not consider one better than the other. In the first field trial we conducted in early March, 1974 (see paragraph 11 of my affidavit of Transco Ex. 38), some of the blankets had longitudinal fasteners, and others had circumferential. To this day I do not consider one better than the other. It is highly situation specific which is best, and PCI uses both types extensively commercially.

Once again this late-in-the-day statement, made only after the "best mode" issues came into the case, is belied by what Pinsky had said before any motive to reshape his recollection arose in that respect.

Thus Pinsky's September 23, 1991 Aff. ¶ 11 (referred to in the just-quoted statement) did *not* really say that both circumferential and longitudinal Velcro © strips were used in the field trials. Instead that earlier statement (P.Ex. 38 ¶ 11) says "we actually installed NUKON © at a nuclear power plant in a field trial in early March, 1974, including blankets with longitudinal Velcro © strips." Surely that is an odd way to describe—as Pinsky would have it—an initial field trial that encompassed both longitudinal and latitudinal types of strips, rather than longitudinal ones alone. And the more normal longitudinal-only reading of that statement is buttressed by the rest of Pinsky's statements in that earlier affidavit (*id.* ¶¶ 7–10):

> [S]hortly after filing of the application, we changed the orientation of the hook and loop strips so that they were longitudinal, as it is in the present NUKON © product illustrated by exhibits 2 and 3 hereto.

This change was made early in November, 1973

> \* \* \* \* \* \*

> Several days after [Jack Sutton] and Ed Cantrel started working on the project it was suggested to reorientate the hook and loop strips so that they were longitudinal instead of circumferential. To the best of my recollection it was Ed Cantrel who originally suggested this change, saying it was an obvious change that he thought would make the blanket more practical to manufacture

> \* \* \* \* \* \*

By November 9, 1973 at the latest we had made an initial decision to apply the hook and loop fasteners longitudinally, as made clear by the OCF inter-company correspondence dated November 12, 1973.

To the identical effect, this opinion has already referred to Pinsky's April 9, 1991 deposition, in which he answered the question "Why did you go from circumferential Velcro to longitudinal Velcro?" by saying "Because it looked better and it fit better" (P.Ex. 54 at 62–63).[15] Once again there was no suggestion that circumferentially-placed Velcro © was also used once the change was decided on.

◼ Even though conventional summary judgment law does not involve credibility determinations, there is a well-established exception that with limited exceptions allows a later affidavit—one submitted only when an issue has been placed on the line by a Rule 56 motion—to be discredited when it is at odds with earlier sworn statements by the same affiant (see, e.g., *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir. 1993)). In the same way, Pinsky's February 23, 1993 affidavit, which stands alone and is contrary to his earlier sworn statements, cannot raise a genuine issue of material fact as to whether Pinsky did not consider longitudi-

---

15. Parenthetically, Pinsky recalled in that deposition that the switch to longitudinal Velcro © was made in November of 1974. But the notes from the Owens Corning meeting indicate that the date was November of 1973, and the language quoted in the preceding paragraph of the text from Pinsky's September 23, 1991 affidavit confirmed that the "change was made early in No-

vember, 1973" and that "[b]y November 9, 1973 at the latest we had made an initial decision to apply the hook and loop fasteners longitudinally, as made clear by the OCF inter-company correspondence dated November 12, 1973." Under all those circumstances 1973 rather than 1974 is established as the relevant date for the change to longitudinally-placed Velcro ©.

nally-placed Velcro © to be the best mode of practicing the invention.

That however is not the end of the analysis on the issue. Performance Contracting argues that even if longitudinally-placed Velcro © strips did become recognized as the best mode of practicing the invention, there was no duty to disclose that decision because it was reached after the filing date of the original application. That argument poses the question whether Pinsky was obligated to reveal the preferred (best mode) longitudinal placement when he filed his continuation application on October 2, 1974 (P.Ex. 4).

■ There is no obligation on an inventor's part to volunteer separately, by way of further disclosure, information learned only after the application is on file—even though of the type that would have been a required best mode disclosure if known at the time of the application. As *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed.Cir. 1987) has said in that context:

> The specificity of disclosure required to comply with the best mode requirement must be determined by the knowledge of facts within the possession of the inventor at the time of filing the application.

Similarly, to prevent an inventor from getting the benefit of an earlier date under Section 120 (a date relating back to the filing of the original application) for any later development, Section 132 prohibits the addition of "new matter" into a reexamination application. Hence *Engel Industries, Inc. v. Lockformer Co.*, 946 F.2d 1528, 1534 (Fed.Cir. 1991) confirms in the context of dealing with a nondisclosure-as-inequitable-conduct contention (what used to be termed "fraud on the Patent Office"):

> There is no opportunity for an inventor to include subsequent improvements or modi-

fications in an application or patent after filing.

But the best mode disclosure requirement is not one that is geared to offering an opportunity for improper expansion of the patent monopoly. Instead it serves the public policy of mandated maximum disclosure by the inventor—and to advance that policy, it is made a precondition to acquiring a legal monopoly at all. Neither *Engel Industries* nor any other Federal Circuit decision has explicitly addressed the question whether an applicant filing a continuation or continuation-in-part application under Section 120 must disclose a best mode arrived at after the initial application was filed (see 2 Donald Chisum, *Patents* § 7.05[2], at 7–151 to –152 (1993)).

Outside of the Federal Circuit, *Carter–Wallace, Inc. v. Riverton Laboratories, Inc.*, 433 F.2d 1034, 1038 (2d Cir.1970) assumed without deciding that the best mode requirement does apply to disclosures made in continuation applications. On the other side of the coin, two district court cases have agreed with Performance Contracting's present stance: *Sylgab Steel and Wire Corp. v. Imoco–Gateway Corp.*, 357 F.Supp. 657 (N.D.Ill. 1973); *Johns–Manville Corp. v. Guardian Indus. Corp.*, 586 F.Supp. 1034 221 U.S.P.Q. 319, 345 (E.D.Mich.1983), *aff'd without published opinion*, 770 F.2d 178 (Fed.Cir.1985).[16]

*Sylgab*, 357 F.Supp. at 658 based its decision on the premise that if a best mode disclosure had to be included in a continuation application, the inclusion of such new matter would deprive the applicant of the benefit of the original filing date normally provided by Section 120 (see also 2 Chisum, § 7.05[2], at 7–152 n. 3.1; Roy Hofer, *The Best Mode Defense After the Federal Circuit's First Decade*, C785 ALI–ABA 1, 5 (1992)). But that is really a non sequitur. Here is Section 120:

16. Performance Contracting repeatedly insists in its memoranda that *Sylgab* controls this Court's decision. That argument may be flattering to district judges, but it is simply wrong. Our Court of Appeals reminds us on occasion that no district court decision has precedential value (see, e.g., *TMF Tool Co., Inc. v. Muller*, 913 F.2d 1185, 1191 (7th Cir.1990)). As much respect as one district judge may have for another (and it

does without saying that that this Court has the greatest of respect for the author of *Sylgab*, now our Court of Appeals' Chief Judge William Bauer), he or she is free to disagree and to reach the opposite result from any earlier decision of the other judge. And as the ensuing text reflects, that is the situation here. For ease of discussion, what follows will refer only to *Sylgab* (*Johns–Manville* simply cites to *Sylgab* at one point in a

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

In terms of the relevant language from that provision, an applicant is entitled to preserve the earlier filing date if "the second application . . . [is] an application for a patent for an invention which is also disclosed in the first application."

 To state the flip side of that language, in order for the inventor to qualify for that treatment as to every facet of the patent's disclosure, his or her second application must not disclose new matter (*In re Shaw*, 202 U.S.P.Q. 285, 291 (Comm'r of Patents & Trademarks 1978)). But all that means is that if new matter *is* introduced, the application is considered a continuation-in-part application and the new matter is not entitled to the earlier filing date (*In re Van Langenhoven*, 458 F.2d 132, 136 (C.C.P.A.1972)).

 Thus *Sylgab* is mistaken in suggesting that Section 120 either establishes or implies a requirement that the continuation application must be identical to the original application in all respects. As long ago explained in *Godfrey v. Eames*, 68 U.S. (1 Wall.) 317, 324–25, 17 L.Ed. 684, (1863):

A change in the specification as filed in the first instance, or the subsequent filing of a new one, whereby a patent is still sought for the substance of the invention as originally claimed, or a part of it, cannot in any wise affect the sufficiency of the original application or the legal consequences flowing from it. To produce that result the new or amended specification must be intended to serve as the basis of the patent for a distinct and different invention, and one not contemplated by the specification, as submitted at the outset.

And *Chicago & N.W. Ry. Co. v. Sayles*, 97 U.S. (7 Otto) 554, 563–64, 24 L.Ed. 1053 (1878) elaborated on the significance of newly introduced matter:

[I]f the amended application and model, filed by [the applicant] five years later, embodied any material addition to or variance from the original—any thing new that was not comprised in that,—such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the mean time, any more than it does in the case of re-issues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the mean time, gone into public use.

 Those and like cases make it abundantly clear that the concern expressed in *Sylgab* is really a non-issue. If information as to the best mode of practicing the invention is added to an application merely to clarify but not to modify the originally disclosed invention, such an addition is entirely proper—that is, it is not really "new matter"—and therefore it does not convert the continuation application into a continuation-in-part application. On the other hand, if the best mode information amounts to a "material addition to or variance from the original," then the original application did not properly cover the new "best mode" anyway. In that situation, continuation-in-part treatment is called for as to any coverage, in the patent grant, of the best mode information as inventive of itself.[17] As *In re Weiler*, 790 F.2d

35–page opinion dealing with a host of other issues).

**17.** *Dow Chemical Co. v. American Cyanamid Co.,* 615 F.Supp. 471, 482 (E.D.La.1985) (*aff'd* with-

out discussing the issue, 816 F.2d 617 (Fed.Cir. 1987)) held that no new best mode disclosure

1576, 1580 (Fed.Cir.1986) has said ·in the reissue context, the question in that respect is "whether the disclosure 'reasonably conveys to one skilled in the art that the inventor had possession of the broad invention at the time the original application was filed.' " [18]

■ What all of this comes down to is that there is no analytic reason that Sections 112 and 120 cannot coexist or, to put it differently, that the policy that informs ·Section 120 should trump the policy that informs Section 112. If an inventor files a continuation application, it serves both of those policies to require the inventor, in the interest of full disclosure, to divulge any intervening best mode information (not known at the time of the initial application but learned before the continuation application has been filed) that really explains rather than expands the nature and scope of the originally claimed invention. In that way the full-disclosure goal of Section 112 is served, while the inventor's original filing date priority is fully preserved under Section 120.

That requirement should be distinguished from imposing an independent requirement on an inventor to update an initial application with each item of added intelligence that, if known at the time of the initial application, would have been required for inclusion then as a matter of best-mode disclosure. That question is not in issue here. Instead the point is that, after all, a continuation application *is* a new filing that involves representations to the Patent and Trademark Office. As with every such representation, it ought to be truthful. And that being so, it is entirely appropriate to apply to those representations the policy that Congress enacted into law in Section 112: Absent express statutory or controlling precedent stating otherwise, this Court is constrained to impose the same best mode disclosure requirements on a continuation application as on an original filing.[19]

■ In this instance the Pinsky patent continuation application failed to disclose the best mode orientation of the Velcro © strips parallel to the junction of the insulation, a determination that had been arrived at almost immediately after the filing of the original application and almost a year before the filing of the continuation application. That violation of the full-disclosure mandate of Section 112 also renders the Pinsky patent invalid.

3. *Essentiality of a Flap Carrying One of the Mating Strips Over To Meet the Other*

Transco also argues that the continuation application was insufficient in best-mode terms because it failed to disclose a flap used to carry one longitudinal fastener strip over to the other (P. 12(m) ¶ 75; P. Mem. 1 at 9–10, P. Mem. 2 at 11–12). Performance Contracting responds both (1) that the flap is not essential and (2) that Figure 1 of the original Pinsky patent application does disclose a flap (D. 12(n) ¶¶ 75–76). Performance Contracting's second contention is a little mysterious: Figure 1 shows circumferential fastening strips, and Performance Contracting does not explain why it would also include a flap with a longitudinal fastener on it or, if the flap did not include a fastener, what would hold the flap down.

As for the other aspect of the parties' dispute, however, Transco's insistence that a flap carrying a longitudinal strip of fastener

was required in a reissue application because no new matter was permissible in reissue applications. However, as the case law makes clear, the notion of "no new matter" in a reissue application goes to material sought to be used to expand the scope of claims or to introduce concepts not present in the parent application (see, e.g. *Dart Industries, Inc. v. Banner,* 636 F.2d 684, 688 (D.C.Cir.1980)).

18. As Chisum § 11.04, at 11–114 explains:
Amendments which merely clarify or make definite that which was expressly or inherently

disclosed in the original application or which conform the specification to matter originally disclosed in the drawings or claims do not violate the rule on new matter.

19. In a way the situation is analogous to the responsibilities of a signing party under Rule 11 (at least unless and until the proposed amendments take effect on December 1, 1993): There is no obligation to correct statements that were in compliance with that Rule when made, but every *new* filing must speak the truth currently.

over to the other side was omitted from the continuation application is really nothing more than another way of putting Transco's contention just dealt with in this opinion: that Pinsky failed to disclose at that point that longitudinal fastener strips were the best mode of practicing the invention. If in fact longitudinal strips worked best, then a flap with one of the strips sewn on necessarily had to be included ·to cause the strips to meet and adhere. Separate consideration of that element of a longitudinal fastening system is unwarranted.

### 4. Composition of the Hooks and Loops in the Fastener Strips

██ Claim 1 of the Pinsky patent said that "woven nylon, hook and loop fasteners" are used in the invention. In that regard the specification explained that "high temperature resistant nylon is preferred." Transco contends that the Pinsky patent is invalid for its failure to disclose that before he filed the initial application Pinsky knew of stainless steel hooks and Nomex © loop [20] fasteners, and that before he filed the continuation application Pinsky knew (1) that simple nylon fasteners could not withstand the heat in containment areas and (2) that stainless steel hooks and Nomex © loops would be used in the fasteners (P. Mem. 1 at 12).

Pinsky testified in deposition (P.Ex. 54, Pinsky 9–12–91 Dep. 137) that he knew in the middle of 1973 that simple nylon is "not satisfactory in a nuclear containment area." He went on to testify (id. at 383) that as of October 12, 1973 he "had made no final decision as to what kind of velcro [he was] going to use," but that as of August 1974 testing had been done and it had been decided that

stainless steel hooks would be used (id. at 391).[21] That testimony is confirmed by objective nontestimonial evidence:

1. P.Ex. 47 is a memo from D.C. Glosser dated August 2, 1974 and sent to Pinsky among others, stating:

> [W]e are changing the manufacturing spec requirements for Velcro fasteners on the inner layer only of our Nuclear Containment pads. The new configuration will include ... Mid-temp hooks (stainless steel).

2. P.Ex. 45 is a memo from Pinsky to R.E. Davis at Owens Corning as to testing of the Nukon product, stating at page 2 under the heading "Observation":

> The nylon hooks burnt off the Nomex base tape as they had done during our last hot pipe test at P.T.L. The change to stainless steel hooks (Mid–Temp) will take care of this.

And to the identical effect, Pinsky also testified that the commercial embodiment of the Nukon product has always incorporated stainless steel hooks (P.Ex. 54, Pinsky 9–12–91 Dep. 245).

Despite all of that, Patrick Pacella (the attorney who prosecuted the patent application) testified in deposition (P.Ex. 55, Pacella 7–30–91 Dep. 100–01) that he was never made aware that stainless steel hooks existed, and he did not recall having been informed of their use in the product. If the disclosure of that element was required in best mode terms but was not made, the nondisclosure was Pinsky's doing and not that of the lawyer.

Once more Pinsky, confronted with the best mode problem, has shifted positions.

---

**20.** Opinion 2 at 623–24 addressed, and decided in the affirmative, the issue of whether Nomex © is substantially equivalent to "high temperature resistant nylon." With no further evidence having been provided by the parties on the subject, that decision stands. Accordingly, Transco's current contention that Pinsky's failure to disclose Nomex © loops presents a best mode problem will not be considered in the absence of a showing comparable to that required in this opinion as to the best-mode fabric: that Pinsky should have disclosed the brand name and supplier of his preferred high temperature resistant nylon because it would not have been known or easily available to one of ordinary skill in the art.

Opinion 2 at 624 also noted that it was not possible to determine from the parties' then-tendered submissions whether high temperature resistant nylon hooks existed. Pinsky's February 9, 1993 Aff. ¶3 makes it clear that as far as Pinsky knows it is not possible to make hooks from high temperature resistant nylon.

**21.** Elsewhere Pinsky testified (id. at 135) that he knew as of September 20, 1974 that stainless steel hooks would be used. Both that date and the one referred to in the text antedated the filing of the continuation application.

Now he seeks to cast doubt on the date on which he became aware that stainless steel hooks would be used—his February 9, 1993 Aff. ¶ 4 says:

While in my deposition pages 135 + it was assumed that the date I came to this determination was September 20, 1974, I am not positive that is the date. I know it was between the first of September and the end of November, 1974, however.

Pinsky has also now said that for single thickness blankets of at least three or four inches, simple nylon hooks would not fail (id. at ¶ 5).

As before, such cases as *Slowiak* teach that this Court is entitled to discredit Pinsky's affidavit statements in contradiction of his earlier sworn testimony. Hence those changes of recollection (to be charitable) cannot serve to create an issue of fact as to whether Pinsky knew, before filing the continuation application, that he considered stainless steel hooks to be an element of the best mode of the invention.

Performance Contracting argues that the claims of the Pinsky patent do not call for nylon hooks, so that there is no best mode problem.[22] However, as Opinion 2 at 625 observed (citing *Spectra–Physics*, 827 F.2d at 1536) "a complete failure to reveal material subject matter can be a violation of the best mode requirement." Pinsky's own testimony unquestionably shows that stainless steel was considered the best material for the hooks—indeed, that stainless steel hooks were the only type that would not disintegrate. Hence any failure to divulge that preferred element surely implicates the best mode requirement.

Performance Contracting tries to avert that result by arguing that the best mode was in fact adequately disclosed—that "by merely applying routine skill from the fastener art in 1974 one would know that if a high temperature nylon was not sufficient to withstand the temperature in a particular environment that one would merely have to go up to the next highest grade (as far as temperature resistance was concerned) of VELCRO" (D. Mem. 1 at 8). But that contention would obliterate the best mode requirement altogether: In essence Performance Contracting contends that it need not have disclosed its own knowledge that stainless steel hooks were the best mode (and, moreover, the *only* workable mode), just because someone who experimented would find that stainless steel hooks were preferable.[23] That notion is impermissible in light of the Section 112 requirement that the inventor make such information, learned in creating the invention, part of the public domain.

Performance Contracting cannot counter that plain statutory meaning by its effort to call upon the *Sherwood* case. *Sherwood*, 613 F.2d at 817 held that the patent application's nondisclosure of a particular computer program used was not fatal under the best mode inquiry where the specification did provide "the general mathematical equations used" as well as a " 'trick' of chopping the physical input seismic traces into segments via a mathematical manipulation." Analogizing the information provided in the specification to making a disclosure in an easily translated foreign language (id. at 817 n. 6), *Sherwood*, id. at 817 said that there was "no cogent reason to require disclosure of the menial tools known to all who practice this art." [24]

22. Opinion 2 at 622 addressed Performance Contracting's contention that its statement in Claim 1 that "the fasteners are two woven nylon, hook and loop mating strips" referred to the material of the strips only, and not to the material of the hooks or loops. That proposed reading is certainly a stretch (id.). In any event the issue turns out to make no difference in the best mode context.

23. Presumably it is true that field tests would demonstrate that simple nylon hooks burned in the heat of nuclear power plant containment areas. But field testing would seem, in this context at least, to be a quite expensive proposi-

tion. Owens Corning's contract with Batelle Memorial Institute, which conducted tests on its product, set a price of $33,265 on the testing (P.Ex. 63 at 4). More to the point, the party seeking a patent monopoly cannot thrust on someone else the burden of learning a best mode embodiment already known to the prospective patentee.

24. Indeed, the court stated (id. at 817 n. 8) that "the detailed disclosure of the analog method in combination with the suggestion that a digital method should be used might be more enlightening to one having ordinary skill in the art than the computer listing or flow chart required by

By sharp contrast, here nothing in the application gave information that would lend itself to such ready translation: Neither the claims nor the specification in the Pinsky patent provided the slightest hint that Pinsky considered stainless steel hooks to be the best mode of practicing the invention.[25]

As was true of the undisclosed best mode as to longitudinal rather than circumferential strips, by the time he filed the continuation application Pinsky had found—but did not disclose that he had found—stainless steel to be the best material for the hooks of his invention. Pinsky's failure to reveal that information is still another nondisclosure that renders the patent invalid under Section 112.

5. *Fiberglass Scrim Between the Glass Wool Batt and the Glass Cover*

 Finally, Transco says that a fiberglass scrim between the glass wool batt and the glass cover has always been used in the Nukon product and that it is an essential element that was not disclosed either in the initial or in the continuation application (P. Mem. 1 at 14–15). In support of its position Transco points to a number of evidentiary items:

1. Pinsky stated in a July 17, 1973 letter to attorney Pacella (P.Ex. 44 at 1):

In our system the wool will most likely be covered top and bottom with a cheap scrim and then quilted prior to covering it with the outer cloth.

2. David John Brown, currently Performance Contracting's sales manager for nuclear plant insulation systems, testified (P.Ex. 57, Brown Dep. 56) that the scrim had been used "since [the] inception" of the product, and he agreed that the scrim "is essential to the operation of the product." Brown explained that "if the binder burns out on the fiberglass, you have a means of retaining the fiberglass in place and you don't have a beanbag" (*id.* at 55–56).[26]

3. In a September 5, 1973 letter, the laboratory that was testing the Pinsky product described the insulation as "consist[ing] of a scrim-covered fiberglass cloth encapsulated in an outer cloth making a blanket" (P.Ex. 63).

4. Similarly, a November 9, 1973 flow chart of the product included a scrim (P.Ex. 38a at 4), as did a 1977 glossary listing the components of Owens Corning's Nuclear Containment Insulation System

the PTO." Performance Contracting's position is also undercut by *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 488 F.2d 382, 388–89 (1st Cir. 1973), a case that *Sherwood*, 613 F.2d at 816 n. 5 viewed as consistent with its own standard. *Dale* held that a disclosure of the broad class of material used was an inadequate disclosure of the best mode. Although the inventor there claimed that experimentation was necessary to determine what material worked best, he had determined that a number of materials within the class did not work, and he had also discovered a specific but undisclosed material that worked quite well. *Dale, id.* at 388–89 agreed with the district court's determination that "the plaintiff's desire to bring all types of insulating material within the scope of its patent claim without disclosing the one material that worked effectively has resulted in a description too vague for an accurate and effective disclosure of the invention" and hence that the patent was invalid under Section 112's best mode requirement.

25. Performance Contracting's inappropriate suggestion that a best mode is adequately disclosed if field tests will ultimately reveal it to a person desiring to practice the invention also calls for a type of experimentation different from what passed muster in *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200 (Fed.Cir.1991). In

excusing the inventor from disclosing the preferred host cells to be used in the invention, *Amgen, id.* at 1210 (emphasis added) said that "there were no starting materials that were not publicly available, *that were not described*, or that required undue experimentation for their preparation in order to carry out the best mode."

26. D. Mem. 2 at 9 attempts to undercut Brown's testimony by stating that he is *"not* a 30(b)(6) witness of PCI, is *not* an expert in insulation, did *not* work for PCI until more than a decade after the Pinsky application was filed, and is *not* someone technically qualified to render an opinion about whether or not any particular component of the patent is, or is not, necessary." Brown went to work for Performance Contracting in 1986. Until 1990 he was regional sales manager, then became sales manager for Engineered Systems Division, the division that manufactures Nukon and conducts all of Performance Contracting's nuclear power plant insulation sales (P.Ex. 68 at 15, 21–22). But surely the sales manager for nuclear plant insulation systems is expected to be familiar with what he is selling, and this Court accepts his opinion testimony on that basis.

and a page from a 1983 Performance Contracting brochure depicting the Nukon blanket (P. Exs. 48, 49).

5. Pinsky himself admitted that scrim "provides better integrity for handling purposes" and a "better product" (Pinsky February 23, 1993 Aff. ¶¶ 14, 17).

6. Finally, Performance Contracting's current sales literature promotes its blankets as being the only ones in the industry to contain a scrim (P.Ex. 66).

Although these pieces of evidence indicate that the Nukon product, in its commercial form, has always employed a scrim, they do not rise to the level of a showing that at the time of filing either the original or continuation application Pinsky considered that a blanket with a scrim was preferable to a blanket without a scrim.[27] His July 17, 1973 letter to Pacella said a scrim would "most likely" be used, not that it was preferred and would be used. Transco's motion for summary judgment of invalidity of the Pinsky patent is therefore denied to the extent that it is grounded on failure to disclose the scrim.

## Conclusion

There is no genuine issue of material fact, and Transco is entitled to a judgment as a matter of law as to the invalidity of the Pinsky patent for failure to comply with the best mode requirement of Section 112 because of nondisclosure of (1) the 603A fabric, (2) the placement of the Velcro © fastener in a position parallel rather than perpendicular to the junction of the insulation and (3) the composition of the hooks of the fastener. This Court declares the Pinsky patent to be invalid for those reasons, but Transco's motion to the same effect is denied as to the fabric flap and the scrim. Performance Contracting's counterclaim for infringement is dismissed. All claims and counterclaims now

27. Transco cites *Dana,* 860 F.2d at 419–20 for the proposition that the fact that an element is found in the commercial embodiment of an invention is evidence that it was considered the best mode of practicing the invention. In *Dana* the evidence that an element was present in the commercial embodiment of the invention merely

having been dealt with, this is the final judgment in this action.

backed up test reports pointing out what was claimed to be the best mode as well as a letter from the inventor to the prosecuting attorney pointing out that the best mode was not disclosed. Transco has presented no such evidence in this case.